UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

---------------------------------------------------------- x
In re:                                                     :   Chapter 11
                                                           :
                                                           :   Case No. 11-15719
CARDINAL FASTENER & SPECIALTY CO.,                         :
INC.,                                                      :   Judge Randolph Baxter
                                                           :
            Debtor.                                        :
---------------------------------------------------------- x

**MOTION OF DEBTOR FOR ORDER AUTHORIZING INTERIM
AND PERMANENT USE OF CASH COLLATERAL AND
GRANTING ADEQUATE PROTECTION**

Cardinal Fastener & Specialty Co., Inc. ("Cardinal"), by and through its undersigned proposed counsel, respectfully moves (the "Motion") the Court pursuant to sections 105(a), 361 and 363 of title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code")[1] and Federal Rule of Bankruptcy Procedure 4001, for entry of an order authorizing Cardinal to utilize cash collateral on an emergency interim basis and, thereafter, on a permanent basis and granting adequate protection. In support of this Motion, Debtor relies upon the *Affidavit of John Grabner in Support of Chapter 11 Petition and First-Day Motions* (the "Grabner Affidavit"), filed concurrently herewith, and respectfully states as follows:

**JURISDICTION, VENUE, AND BASIS FOR RELIEF**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Among other things, Sections 105(a) and 363(c) of the Bankruptcy Code, rule 9013 of the Federal Rules of Bankruptcy Procedure, and Local Rule 9013-1(a) form the basis for the relief requested herein.

---

[1] Unless otherwise defined or stated herein, all "Section" references are to the Bankruptcy Code.

4069554.1

## BACKGROUND

2. On June 30, 2011 (the "Petition Date"), Cardinal commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. Cardinal continues in possession of its properties and assets and is operating and managing its business as debtor-in-possession pursuant to Sections 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed this case.

### *Cardinal and Cardinal's Business*

4. Cardinal, founded in 1983, is the largest fastener manufacturer of large diameter, hot forged bolts in North America. Using American-made steel, Cardinal supplies all grades, head styles, and diameters. Cardinal's customer base consists of certain "legacy" industries, primarily the construction, original equipment manufacturing, and oil and gas industries. Cardinal also supplies goods for maintenance and repair operations. Cardinal is one of the few manufacturers that complies with all guidelines for these safety critical products by manufacturing with a flat bearing surface. Cardinal's manufacturing process includes the performance of magnetic particle testing in its in-house A2LA (American Association for Laboratory Accreditation) accredited laboratory.

5. Recognizing the rapidly growing "green" energy sector, in 2007 Cardinal began to manufacture fasteners for a wind turbine builder in need of parts quickly. By January 2009, Cardinal was the world's first fastener manufacturer to obtain ISO 9001:2008 certification—its customers' metric for quality management and performance in this field. Cardinal is now approved by most of the wind turbine manufacturers as either their sole or primary supplier of safety critical fasteners. Cardinal was also named the 2010 "Supplier of the Year" by AWEA (American Wind Energy Association). Despite adversity, described below, during 2010

Cardinal's overall business grew by 38%, with its wind business alone growing by over 200%. In 2011, Cardinal's overall business was experiencing 50% growth.

6. Cardinal's reputation for quality products was further acknowledged in 2009, when then President-Elect Barack Obama, just four days before his inauguration, spent a day visiting with Cardinal and its employees. He recognized Cardinal Fastener as an "iconic," family-owned manufacturer, with three generations involved, whose "[bolts] are used everywhere . . . from coast to coast . . . in the Statue of Liberty and in the Golden Gate Bridge." (Transcript of President-Elect Barack Obama, January 19, 2009, available at: http://www.clevelandleader.com/node/8587.) Shortly thereafter Cardinal become a national face for American manufacturing and job growth.

### *Prepetition Secured Credit Agreements*

7. Cardinal's senior secured creditor pursuant to a term loan and working capital revolver is Wells Fargo Bank, N.A. ("Wells Fargo"). Wells Fargo asserts a claim in the amount of approximately $1,786,482 as of the Petition Date (consisting of approximately $438,735 on account of the term loan and $1,394,444 on account of the revolver) secured by a lien on substantially all of Cardinal's assets.[2] The Wells Fargo balance has been paid down (on a voluntary and involuntary basis) by approximately $1,159,860 over the last year. Cardinal's subordinate secured creditor is Grow America Fund, Inc., ("Grow America" and, together with Wells Fargo, the "Secured Lenders"), which asserts a claim in the amount of approximately $851,396 as of the Petition Date secured by a second lien on substantially all of Cardinal's personal property.

---

[2] Nothing contained herein is or shall be deemed to be an admission or allegation as to the nature, extent, validity, or priority of any lien claim, interest, or encumbrance.

*Events Leading to the Chapter 11 Filing*

Pre-Petition Defaults Under Wells Fargo Credit Agreement

8.  In or around August 2010, Cardinal defaulted under certain non-payment covenants under the Wells Fargo credit agreement, namely certain profitability and fixed-charge coverage ratios. Due to these non-payment defaults, Cardinal and Wells Fargo entered into a forbearance agreement dated August 13, 2010.

9.  On March 28, 2011, Cardinal and Wells Fargo entered into a further forbearance agreement which, among other things, allowed for an over borrowing on Cardinal's working capital line of credit, supported by certain accounts receivable. From the period of March 28, 2011 until May 30, 2011, the maximum over borrowing of $350,000 was reduced to zero. In addition, Wells reduced its advance rate on Cardinal's machinery and equipment by $700,000 over the past nine months. As a result, Cardinal entered into an over-advance position under the working capital line of credit as of May 30, 2011. Based on this default condition, Wells ceased providing additional advances and prohibited Cardinal from using the proceeds from its cash collections. Throughout this time, Cardinal never missed a payment of principal or interest to Wells Fargo.

Inventory Misclassification

10. Following a review of its financial statements by its independent accountants, Cardinal discovered approximately $2.7 million incorrectly classified as inventory. $1.7 million was correctly reclassified to property, plant, and equipment. The remaining $1.0 million specifically consisted of startup expenditures incurred in connection with Cardinal's development of the wind turbine industry business. This occurred because Cardinal understood that certain one-time expenditures for starting a new business could be capitalized as an asset, as is the practice with its competitors in Europe. Cardinal subsequently was informed by its

accountants that GAAP required it to book these expenditures as an expense. In response, Cardinal revised its financial statements to correctly classify the $1.0 million as wind development investment expense. Cardinal also terminated the employment of its then chief financial officer, and notified Wells Fargo of the accounting error in May 2011. Within a week, Cardinal presented the restated balance sheets for 2010 and 2011.[3]

## The Fallout

11. In view of the over-advance, inventory misclassification, and other alleged defaults under the Wells Fargo credit agreement, in May 2011 Wells Fargo indicated its intent to proceed with liquidating Cardinal's assets in order to satisfy its alleged loan balance. In furtherance of this goal, Wells Fargo began sweeping Cardinal's accounts at the bank regularly, leaving Cardinal largely unable to pay day-to-day business expenses.

12. On or about June 14, 2011, Cardinal requested the use of its cash in order to fund a payroll in the amount of approximately $59,000, which request Wells Fargo funded on the same day. Later that day, however, after direct deposit paychecks were issued to Cardinal's employees, Wells Fargo withdrew the funding. Similarly, or about June 17, 2011, Wells Fargo funded the payroll account, only to withdraw the funding again without explanation. These actions resulted in a number of employees cashing "nsf" checks, thus compromising their own ability to make daily ends meet. Due to its inability to make payroll, on June 17, 2011, Cardinal was forced to layoff approximately 19.5 hourly and 13.5 salaried employees.

13. Since the layoff, Cardinal has remained largely idle. Its limited operations are supported by a skeleton crew of employees, former employees, and family members—all of which are working on a volunteer basis—fielding customer calls, collecting receivables, providing information to Wells Fargo's on-site auditor, and generally trying to preserve the value

---

[3] Of the $1,000,000, only $600,000 was ever included in Wells Fargo's borrowing base; the difference was

of Cardinal's assets in order to effectuate an exit strategy. Despite a number of requests, and the fact that Cardinal's continued operations are primarily, if not exclusively, for the benefit of Wells Fargo, the bank has declined to allow any further use of cash in order to pay expenses.

*Value Maximizing Exit Strategy*

14. Since approximately June 1, 2011, Cardinal has been exploring a sale of substantially all of its assets and/or a recapitalization of its balance sheet in order to pay Wells Fargo in full, preserve its going-concern business for the benefit of all creditors, and ensure continued employment for dozens of Cleveland area employees. In connection with these efforts, Cardinal engaged the investment banking firm League Park Advisors ("League Park"). Cardinal's efforts and League Park's expertise have generated substantial interest in Cardinal. As of the date of this Affidavit no less than four parties have expressed serious interest in purchasing all or substantially all of Cardinal's assets, and no less than three parties have expressed serious interest in infusing capital pursuant to a plan of reorganization. Cardinal also has been actively exploring replacement lenders for Wells Fargo since May 2011.

15. In view of the foregoing, on July 7, 2011, a potential buyer/investor from Germany is scheduled to meet with representatives of Cardinal, in order to tour the facility, observe operations (if resumed), and continue due diligence. Cardinal believes this entity is a viable candidate to serve as a stalking-horse bidder to purchase all or substantially all of Cardinal's assets and/or sponsor a plan of reorganization.

16. Cardinal believes that a going-concern exit, be it by competitive auction sale or traditional reorganization, will yield substantially more value for creditors than a liquidation of its assets by Wells Fargo. In furtherance of this effort, it is imperative for ordinary operations to

---

classified as ineligible inventory.

resume at a level consistent with the level at which Cardinal was operating before Wells Fargo denied the use of cash collateral in order to fund payroll.

**RELIEF REQUESTED**

17. By this Motion, Cardinal seeks authority to use cash collateral ("Cash Collateral") as that term is defined in section 363(a) of the Bankruptcy Code and provide adequate protection to secured creditors with an interest in such cash collateral. Cardinal seek interim use of Cash Collateral pending a final hearing on this Motion.

**BASIS FOR RELIEF**

18. One of Cardinal's pressing concerns is the need for immediate use of Cash Collateral on an interim basis pending a final hearing. Federal Rule of Bankruptcy Procedure 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to Section 363 may not be commenced earlier than 15 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on the motion and authorize the restricted use of cash collateral to the extent necessary to avoid immediate and irreparable damage to Cardinal's estate. Cardinal requires the use of Cash Collateral to pay present operating expenses, including payroll, and to pay vendors to ensure a continued supply of goods and services essential to Cardinal's continued viability.

19. Cardinal's ordinary course operations generate Cash Collateral through the collection of accounts receivable. The Lenders assert a security interest in Cardinal's Cash Collateral.

20. Cardinal requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business. Without the use of Cash Collateral, Cardinal's operations will be substantially, immediately, and irreparably harmed. The continued operation of Cardinal's business is essential to its reorganization effort.

21. In order to avoid immediate and irreparable harm to Cardinal's estate pending a final hearing on this Motion, Cardinal requires the interim use of Cash Collateral for a five (5) week period through August 5, 2011, to pay, among other things, past-due and ongoing payroll, utilities, taxes, insurance, vendors, and other ordinary business costs and expenses.

22. The Cash Collateral proposed to be used by Cardinal consists of cash on hand and cash to be generated from the continued operation of the Cardinal' businesses and collection of accounts receivable.

23. Cardinal believes and maintains that the Secured Lenders are adequately protected in any Cash Collateral that Cardinal may use. As adequate protection for any interest in Cash Collateral that the Secured Lenders have or may have, Cardinal is willing to grant the Secured Lenders replacement liens in Cardinal's postpetition Cash Collateral, to the same extent, priority and validity as Secured Lenders' prepetition liens, if any, and only to the extent that Cardinal diminishes such Cash Collateral. The proposed replacement liens will provide sufficient adequate protection to prevent any diminution in value to the Secured Lenders.

24. Cardinal seeks to use Cash Collateral in accordance with its proposed consolidated budget (with allowance for overage on each expense item not to exceed 10% in the aggregate), a copy of which is attached hereto as Exhibit A (the "Budget"), for a five (5) week period (the "Period") and thereafter upon further order of this Court, following a final hearing on this Motion, on a permanent basis, in accordance with its operating needs. The Budget projects that Cardinal's operations will be cash neutral-to-positive for the Period.

25. Section 105(a) of the Bankruptcy Code provides that the Court may issue any order "necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Cardinal's use of Cash Collateral as permitted by this Motion is essential to its ability to successfully reorganize.

26. Moreover, section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

27. Cardinal needs immediate authority to use Cash Collateral to fund day-to-day operations. In sum, the authorization to use Cash Collateral will preserve the going concern value of Cardinal.

28. Cardinal maintains that use of Cash Collateral is absolutely essential for operations and, therefore, is in the best interest of its creditors and estates to authorize the use of Cash Collateral.

## MEMORANDUM OF LAW

29. Pursuant to Local Bankruptcy Rule 9013-1(a), because there are no novel questions of law presented herein and because appropriate authorities are cited in this Motion, Cardinal respectfully request that the Court waive the requirement that Cardinal file a memorandum of law in support of this Motion.

## NOTICE

30. Notice of the Motion has been given to (a) the Office of the United States Trustee for Region IX; (b) Wells Fargo Bank, National Association and Grow America Fund, Inc., the secured creditors; (c) the Debtor's financial institutions; (d) the Debtor's top 20 general unsecured creditors, (e) the Internal Revenue Service, and (f) all parties that have filed a request for notice or notice of appearance as of the date of this Motion. The Debtor respectfully submits that, under the circumstances, no other or further notice need be given.

WHEREFORE, for the foregoing reasons, Cardinal respectfully requests that this Court enter an Order, in the form attached hereto as Exhibit B, (i) authorizing Cardinal's use of Cash

Collateral on an emergency interim basis and, following a final hearing on this Motion, (ii) authorizing Cardinal to utilize Cash Collateral on a permanent basis without further order of Court, and (iii) granting Cardinal such other and further relief as is just and equitable.

Date: June 30, 2011                                     Respectfully submitted by:

                                                          /s/ Rocco I. Debitetto
Rocco I. Debitetto (0073878)
Emily W. Ladky (0085527)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone:  (216) 621-0150
Facsimile:   (216) 241-2824
E-Mail:      ridebitetto@hahnlaw.com
              eladky@hahnlaw.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

# EXHIBIT A

4069554.1

|   | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | **July** | | | | | **August** | | | | **September** | |
| 6 | | | | | **Week 7/4** | **Week 7/11** | **Week 7/18** | **Week 7/25** | **Week 8/1** | **Week 8/8** | **Week 8/15** | **Week 8/22** | **Week 8/29** | **Week 9/5** | **Week 9/12** | **Week 9/19** | **Week 9/26** |
| 7 | | | | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 8 | **Cash Collected** | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | |
| 10 | | Accounts Receivable | | | 111,238 | 61,238 | 52,147 | 70,086 | 81,935 | 106,123 | 97,223 | 106,978 | 117,568 | 121,404 | 113,446 | 114,530 | 122,598 |
| 11 | | Accounts Receivable - Vestas | | | 185,496 | - | - | - | - | - | - | - | - | - | - | - | - |
| 12 | | Proceeds from Sale of Equipment | | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 14 | | **Total Cash Collections** | | | **296,734** | **61,238** | **52,147** | **70,086** | **81,935** | **106,123** | **97,223** | **106,978** | **117,568** | **121,404** | **113,446** | **114,530** | **122,598** |
| 15 | | | | | | | | | | | | | | | | | |
| 16 | **Cash Out** | | | | | | | | | | | | | | | | |
| 17 | | Accounts Payable | | | (92,060) | (33,074) | (54,499) | (61,063) | (59,028) | (56,865) | (44,373) | (55,468) | (52,062) | (70,686) | (61,375) | (55,125) | (57,125) |
| 18 | | Prepetitiona employee related expenses | | | (40,000) | (20,000) | (20,000) | | | | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (2,000) |
| 19 | | Payroll, Taxes and Benefits | | | (19,670) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) |
| 20 | | Utility Deposits | | | (18,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | | Legal Counsel | | | 0 | 0 | 0 | (32,000) | (8,000) | (8,000) | (8,000) | (8,000) | (8,000) | (8,000) | 0 | 0 | 0 |
| 22 | | Investment Banker | | | 0 | 0 | 0 | (5,000) | 0 | 0 | (5,000) | 0 | 0 | 0 | (5,000) | 0 | 0 |
| 23 | | Financial Advisor Fees | | | 0 | 0 | 0 | (12,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) |
| 25 | | **Net Cash (Used in) Operations** | | | **(169,730)** | **(76,657)** | **(98,083)** | **(133,647)** | **(93,611)** | **(91,448)** | **(103,956)** | **(110,052)** | **(106,646)** | **(125,269)** | **(112,959)** | **(101,709)** | **(85,709)** |
| 27 | | Cash & Cash Equivalents - Beginning | | | 10,000 | 137,004 | 121,585 | 75,649 | 12,088 | 412 | 15,087 | 8,353 | 5,279 | 16,201 | 12,336 | 12,823 | 25,644 |
| 28 | | | | | | | | | | | | | | | | | |
| 29 | | **Cash & Cash Equivalents - Ending** | | | **$137,004** | **$121,585** | **$75,649** | **$12,088** | **$412** | **$15,087** | **$8,353** | **$5,279** | **$16,201** | **$12,336** | **$12,823** | **$25,644** | **$62,533** |
| 30 | | | | | | | | | | | | | | | | | |

# EXHIBIT B

4069554.1

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ------------------------------------------------------- x | | Chapter 11 |
| In re: | : | |
| | : | Case No. 11-15719 |
| CARDINAL FASTENER & SPECIALTY CO., | : | |
| INC., | : | Judge Randolph Baxter |
| | : | |
| Debtor. | : | |
| ------------------------------------------------------- x | | |

## INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL

Upon consideration of the *Motion of Debtor for Order Authorizing Interim and Permanent Use of Cash Collateral and Granting Adequate Protection*, dated June 30, 2011 (the "Motion"), filed on behalf of Cardinal Fastener & Specialty Co., Inc. ("Cardinal" or "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Case"), for entry of an order (a) authorizing interim and permanent use of Cash Collateral[1] and granting adequate protection, and (b) seeking an emergency hearing on the Motion to consider the entry of an interim order pursuant to Bankruptcy Rule 4001 (this "Order") authorizing Cardinal, *inter alia*, to use the Cash Collateral, all upon the terms and conditions set forth herein pending the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

INTERIM CASH COLLATERAL ORDER - 4069570.1

Final Hearing referred to below; and (c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis, *inter alia*, the use of the Cash Collateral; and based upon the Grabner Affidavit, and after due deliberation and hearing, this Court finds that: (i) it has jurisdiction over the matters raised in the Motion under 28 U.S.C. §§ 157 and 1334; (ii) venue of this matter is proper under 28 U.S.C. §§ 1408 and 1409; (iii) this matter is a core proceeding under 28 U.S.C. § 157(b)(2); (iv) the relief requested in the Motion is in the best interests of Cardinal, its estates, creditors, and other parties in interest; (v) adequate and proper notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; and (vi) good and sufficient cause exists for the granting of the relief requested in the Motion as set forth herein. Accordingly,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Motion is GRANTED on an interim basis.

2. To the extent that the Secured Lenders have valid, perfected and enforceable security interests in Cardinal's cash collateral ("Cash Collateral") as that term is defined under Bankruptcy Code Section 363(a), Cardinal may use Cash Collateral for the period commencing on the Petition Date to pay those items delineated in the budget attached hereto as Exhibit A (with a variance from actual-to-projected ending cash balance weekly not to exceed 10%, collectively, the "Budget") through and including August 5, 2009. Cardinal may, from time to time, submit to the Secured Creditors and any creditors' committee a revised cash budget, which budget, so long as it is cash neutral shall be deemed to be the Budget upon Cardinal's filing a Notice with the Court stating that such budget is cash neutral.

3. As adequate protection for any such interest in Cash Collateral used by Cardinal, the Secured Lenders are granted replacement liens upon, and security interests in, Cardinal's post-petition Cash Collateral, but only to the extent that Cardinal diminishes such Cash Collateral, and in no event to exceed the type, kind, priority and amount, if any, which existed on the Petition Date.

4. A further interim hearing to consider the Motion is scheduled for the _____ day of _____, 2011, at __:__ _.m. ET. Any objections to the further use of Cash Collateral must be filed with the Bankruptcy Court and served upon counsel for Cardinal on or before _____ ___, 2011.

5. A copy of this Order shall be served by Cardinal or its counsel, by regular mail on the United States Trustee, the Secured Lenders, any other known lenders, lien claimants and parties in interest, all persons requesting notices herein, and on Cardinal's twenty (20) largest unsecured creditors as identified by Cardinal, within five (5) days after entry of this Order.

6. If notice is given in the manner provided herein, said notice shall be sufficient and proper and in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.

7. Nothing in the Motion or this Order shall be construed to impair Cardinal's right, or the rights of Cardinal's estate, to contest the nature, extent, validity, or priority of any alleged lien, claim, or encumbrance of the Secured Lenders.

8. The memorandum of law requirement of Local Bankruptcy Rule 9013-1(a) is hereby waived with respect to the Motion only.

9. This Order shall be immediately effective and enforceable upon entry.

IT IS SO ORDERED.

# # #

Prepared and submitted by:

/s/ DRAFT
Rocco I. Debitetto (0073878)
Emily W. Ladky (0085527)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone: (216) 621-0150
Facsimile: (216) 241-2824
E-Mail: ridebitetto@hahnlaw.com
 eladky@hahnlaw.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

# EXHIBIT A
## (Budget)

|   | July | | | | August | | | | September | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | **Week 7/4** | **Week 7/11** | **Week 7/18** | **Week 7/25** | **Week 8/1** | **Week 8/8** | **Week 8/15** | **Week 8/22** | **Week 8/29** | **Week 9/5** | **Week 9/12** | **Week 9/19** | **Week 9/26** |
|   | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Cash Collected** | | | | | | | | | | | | | |
| Accounts Receivable | 111,238 | 61,238 | 52,147 | 70,086 | 81,935 | 106,123 | 97,223 | 106,978 | 117,568 | 121,404 | 113,446 | 114,530 | 122,598 |
| Accounts Receivable - Vestas | 185,496 | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Sale of Equipment | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Collections** | 296,734 | 61,238 | 52,147 | 70,086 | 81,935 | 106,123 | 97,223 | 106,978 | 117,568 | 121,404 | 113,446 | 114,530 | 122,598 |
| **Cash Out** | | | | | | | | | | | | | |
| Accounts Payable | (92,060) | (33,074) | (54,499) | (61,063) | (59,028) | (56,865) | (44,373) | (55,468) | (52,062) | (70,686) | (61,375) | (55,125) | (57,125) |
| Prepetitiona employee related expenses | (40,000) | (20,000) | (20,000) | | | | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (2,000) |
| Payroll, Taxes and Benefits | (19,670) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) | (23,584) |
| Utility Deposits | (18,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Counsel | 0 | 0 | 0 | (32,000) | (8,000) | (8,000) | (8,000) | (8,000) | (8,000) | (8,000) | 0 | 0 | 0 |
| Investment Banker | 0 | 0 | 0 | (5,000) | 0 | 0 | (5,000) | 0 | 0 | 0 | (5,000) | 0 | 0 |
| Financial Advisor Fees | 0 | 0 | 0 | (12,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) |
| **Net Cash (Used in) Operations** | (169,730) | (76,657) | (98,083) | (133,647) | (93,611) | (91,448) | (103,956) | (110,052) | (106,646) | (125,269) | (112,959) | (101,709) | (85,709) |
| Cash & Cash Equivalents - Beginning | 10,000 | 137,004 | 121,585 | 75,649 | 12,088 | 412 | 15,087 | 8,353 | 5,279 | 16,201 | 12,336 | 12,823 | 25,644 |
| **Cash & Cash Equivalents - Ending** | $137,004 | $121,585 | $75,649 | $12,088 | $412 | $15,087 | $8,353 | $5,279 | $16,201 | $12,336 | $12,823 | $25,644 | $62,533 |