UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

---------------------------------------------------------- x  Chapter 11
In re:                                                   :
                                                         :  Case No. 11-15719
CARDINAL FASTENER & SPECIALTY CO.,                       :
INC.,                                                    :  Judge Randolph Baxter
                                                         :
                        Cardinal.                        :
---------------------------------------------------------- x

## AFFIDAVIT OF JOHN GRABNER IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST-DAY MOTIONS

STATE OF OHIO        )
                     )   SS:
COUNTY OF CUYAHOGA   )

I, JOHN GRABNER, hereby declare and state:

1. I am a president of Cardinal Fastener & Specialty Co., Inc. ( "Cardinal"). I have held this position since September 1983. As a result of my position, I am familiar with the day-to-day operations, businesses, financial affairs and books and records of Cardinal. I submit this Affidavit (the "Affidavit") in support of Cardinal's petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1542 (the "Bankruptcy Code")[1] filed on the date hereof (the "Petition Date") and (b) the "first-day" relief that Cardinal has requested in certain motions and applications filed with the Court (collectively, the "First-Day Motions"),[2] and to assist the Court and other parties in understanding the circumstances that compelled the commencement of Cardinal's chapter 11 case.

2. The relief sought in the First-Day Motions is intended to enable Cardinal to transition effectively into chapter 11 and to avoid and minimize certain adverse consequences that might otherwise result from the commencement of the case. In particular, the First-Day

---

[1] Unless otherwise defined or stated herein, all "Section" references are to the Bankruptcy Code.
[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First-Day Motions.
4069426.3

Motions seek relief aimed at maintaining employee morale, continuing operations of Cardinal's business, and preserving the going-concern value of Cardinal's assets for the benefit of all creditors, all of which are critical to Cardinal's reorganization efforts. I have reviewed the First-Day Motions and I believe that the relief sought therein is essential to ensure operation of Cardinal's businesses and the success of Cardinal's reorganization efforts.

3. Except as may otherwise be indicated, all facts set forth in this Affidavit are based upon personal knowledge, my review of relevant documents or my opinion based upon experience, knowledge and information concerning the operations of Cardinal. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of Cardinal.

## BACKGROUND

4. On the Petition Date, Cardinal commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. Cardinal is continuing in possession of its properties and assets and is operating and managing its business as debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in Cardinal's chapter 11 case (the "Case").

### *Cardinal and Cardinal's Business*

6. Cardinal, founded in 1983, is the largest fastener manufacturer of large diameter, hot forged bolts in North America. Using American-made steel, Cardinal supplies all grades, head styles, and diameters. Cardinal's customer base consists of certain "legacy" industries, primarily the construction, original equipment manufacturing, and oil and gas industries. Cardinal also supplies goods for maintenance and repair operations. Cardinal is one of the few manufacturers that complies with all guidelines for these safety critical products by

4069426.3

manufacturing with a flat bearing surface. Cardinal's manufacturing process includes the performance of magnetic particle testing in its in-house A2LA (American Association for Laboratory Accreditation) accredited laboratory.

7. Recognizing the rapidly growing "green" energy sector, in 2007 Cardinal began to manufacture fasteners for a wind turbine builder in need of parts quickly. By January 2009, Cardinal was the world's first fastener manufacturer to obtain ISO 9001:2008 certification—its customers' metric for quality management and performance in this field. Cardinal is now approved by most of the wind turbine manufacturers as either their sole or primary supplier of safety critical fasteners. Cardinal was also named the 2010 "Supplier of the Year" by AWEA (American Wind Energy Association). Despite adversity, described below, during 2010 Cardinal's overall business grew by 38%, with its wind business alone growing by over 200%. In 2011, Cardinal's overall business was experiencing 50% growth.

8. Cardinal's reputation for quality products was further acknowledged in 2009, when then President-Elect Barack Obama, just four days before his inauguration, spent a day visiting with Cardinal and its employees. He recognized Cardinal Fastener as an "iconic," family-owned manufacturer, with three generations involved, whose "[bolts] are used everywhere . . . from coast to coast . . . in the Statue of Liberty and in the Golden Gate Bridge." (Transcript of President-Elect Barack Obama, January 19, 2009, available at: http://www.clevelandleader.com/node/8587.) Shortly thereafter Cardinal become a national face for American manufacturing and job growth.

### *Prepetition Secured Credit Agreements*

9. Cardinal's senior secured creditor pursuant to a term loan and working capital revolver is Wells Fargo Bank, N.A. ("Wells Fargo"). Wells Fargo asserts a claim in the amount of approximately $1,786,482 as of the Petition Date (consisting of approximately $438,735 on

4069426.3

account of the term loan and $1,394,444 on account of the revolver) secured by a lien on substantially all of Cardinal's assets.[3] The Wells Fargo balance has been paid down (on a voluntary and involuntary basis) by approximately $1,159,860 over the last year. Cardinal's subordinate secured creditor is Grow America Fund, Inc., ("Grow America" and, together with Wells Fargo, the "Secured Lenders"), which asserts a claim in the amount of approximately $851,396 as of the Petition Date secured by a second lien on substantially all of Cardinal's personal property.

### *Events Leading to the Chapter 11 Filing*

Pre-Petition Defaults Under Wells Fargo Credit Agreement

10. In or around August 2010, Cardinal defaulted under certain non-payment covenants under the Wells Fargo credit agreement, namely certain profitability and fixed-charge coverage ratios. Due to these non-payment defaults, Cardinal and Wells Fargo entered into a forbearance agreement dated August 13, 2010.

11. On March 28, 2011, Cardinal and Wells Fargo entered into a further forbearance agreement which, among other things, allowed for an over borrowing on Cardinal's working capital line of credit, supported by certain accounts receivable. From the period of March 28, 2011 until May 30, 2011, the maximum over borrowing of $350,000 was reduced to zero. In addition, Wells reduced its advance rate on Cardinal's machinery and equipment by $700,000 over the past nine months. As a result, Cardinal entered into an over-advance position under the working capital line of credit as of May 30, 2011. Based on this default condition, Wells ceased providing additional advances and prohibited Cardinal from using the proceeds from its cash collections. Throughout this time, Cardinal never missed a payment of principal or interest to Wells Fargo.

---

[3] Nothing contained herein is or shall be deemed to be an admission or allegation as to the nature, extent, validity, or
4069426.3

### Inventory Misclassification

12. Following a review of its financial statements by its independent accountants, Cardinal discovered approximately $2.7 million incorrectly classified as inventory. $1.7 million was correctly reclassified to property, plant, and equipment. The remaining $1.0 million specifically consisted of startup expenditures incurred in connection with Cardinal's development of the wind turbine industry business. This occurred because Cardinal understood that certain one-time expenditures for starting a new business could be capitalized as an asset, as is the practice with its competitors in Europe. Cardinal subsequently was informed by its accountants that GAAP required it to book these expenditures as an expense. In response, Cardinal revised its financial statements to correctly classify the $1.0 million as wind development investment expense. Cardinal also terminated the employment of its then chief financial officer, and notified Wells Fargo of the accounting error in May 2011. Within a week, Cardinal presented the restated balance sheets for 2010 and 2011.[4]

### The Fallout

13. In view of the over-advance, inventory misclassification, and other alleged defaults under the Wells Fargo credit agreement, in May 2011 Wells Fargo indicated its intent to proceed with liquidating Cardinal's assets in order to satisfy its alleged loan balance. In furtherance of this goal, Wells Fargo began sweeping Cardinal's accounts at the bank regularly, leaving Cardinal largely unable to pay day-to-day business expenses.

14. On or about June 14, 2011, Cardinal requested the use of its cash in order to fund a payroll in the amount of approximately $59,000, which request Wells Fargo funded on the same day. Later that day, however, after direct deposit paychecks were issued to Cardinal's

---

priority of any lien claim, interest, or encumbrance.
[4] Of the $1,000,000, only $600,000 was ever included in Wells Fargo's borrowing base; the difference was classified as ineligible inventory.
4069426.3

employees, Wells Fargo withdrew the funding. Similarly, or about June 17, 2011, Wells Fargo funded the payroll account, only to withdraw the funding again without explanation. These actions resulted in a number of employees cashing "nsf" checks, thus compromising their own ability to make daily ends meet. Due to its inability to make payroll, on June 17, 2011, Cardinal was forced to layoff approximately 19.5 hourly and 13.5 salaried employees.

15. Since the layoff, Cardinal has remained largely idle. Its limited operations are supported by a skeleton crew of employees, former employees, and family members—all of which are working on a volunteer basis—fielding customer calls, collecting receivables, providing information to Wells Fargo's on-site auditor, and generally trying to preserve the value of Cardinal's assets in order to effectuate an exit strategy. Despite a number of requests, and the fact that Cardinal's continued operations are primarily, if not exclusively, for the benefit of Wells Fargo, the bank has declined to allow any further use of cash in order to pay expenses.

*Value Maximizing Exit Strategy*

16. Since approximately June 1, 2011, Cardinal has been exploring a sale of substantially all of its assets and/or a recapitalization of its balance sheet in order to pay Wells Fargo in full, preserve its going-concern business for the benefit of all creditors, and ensure continued employment for dozens of Cleveland area employees. In connection with these efforts, Cardinal engaged the investment banking firm League Park Advisors ("League Park"). Cardinal's efforts and League Park's expertise have generated substantial interest in Cardinal. As of the date of this Affidavit no less than four parties have expressed serious interest in purchasing all or substantially all of Cardinal's assets, and no less than three parties have expressed serious interest in infusing capital pursuant to a plan of reorganization. Cardinal also has been actively exploring replacement lenders for Wells Fargo since May 2011.

17. In view of the foregoing, on July 7, 2011, a potential buyer/investor from Germany is scheduled to meet with representatives of Cardinal, in order to tour the facility, observe operations (if resumed), and continue due diligence. Cardinal believes this entity is a viable candidate to serve as a stalking-horse bidder to purchase all or substantially all of Cardinal's assets and/or sponsor a plan of reorganization.

18. Cardinal believes that a going-concern exit, be it by competitive auction sale or traditional reorganization, will yield substantially more value for creditors than a liquidation of its assets by Wells Fargo. In furtherance of this effort, it is imperative for ordinary operations to resume at a level consistent with the level at which Cardinal was operating before Wells Fargo denied the use of cash collateral in order to fund payroll.

## First-Day Motions

A. <u>Honoring Existing Obligations</u>

> **Motion of Debtor and Debtor-in-Possession for Order (A) Authorizing Debtor to Pay Prepetition Wages, Salaries and Commissions to Employees; (B) Authorizing Debtor to Pay Prepetition Benefits and Continue Employee Benefit Programs; and (C) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations**

19. Pursuant to this Motion, the Debtor seeks authority under Bankruptcy Code Sections 105(a), 363(b), 507(a)(4), (5) and (8), and 541(b)(7) to pay certain prepetition obligations to and on behalf of the Debtor's hourly and salaried employees, and any independent contractors hired by Debtor performing duties generally and customarily performed by hourly or salaried employees of Debtor (collectively, the "<u>Employees</u>"). As more fully set forth below, these prepetition obligations may include, but are not limited to: (a) amounts owed to the Employees for wages, salaries, incentives, and other accrued compensation, including Payroll Obligations (as hereafter defined) and Non-Payroll Compensation (as hereafter defined); (b) amounts owed to independent sale representatives (the "<u>Independent Contractor Obligations</u>");

4069426.3

(c) all other Employee benefits including but not limited to medical benefits, dental benefits, prescription plan, short-term disability benefits, accidental death and dismemberment benefits, 401(k) plan contributions, and life insurance, together with all costs and expenses incurred in connection with the servicing and processing of such claims (collectively, the "<u>Prepetition Benefits</u>"); (d) federal, state, and local payroll-related taxes and insurance deductions and withholdings, such as FICA, FUI, and SUI, covering various benefits and fees due to third-party payroll and benefits administrators as well as amounts due to other third parties for garnishments, domestic/child support, other employee payments and the like (collectively, the "<u>Third-Party Obligations</u>"); (e) reimbursements for typical expenses incurred by Employees in connection with conducting business for or on behalf of the Debtor for travel, lodging, meals, auto expenses and other reimbursable business expenses (collectively, the "<u>Reimbursement Obligations</u>"); and (f) amounts owed for workers' compensation (the "<u>Workers' Compensation Benefits</u>" and together with the Payroll Obligations, Non-Payroll Compensation, Independent Contractor Obligations, Prepetition Benefits, the Third-Party Obligations, the Reimbursement Obligations, and the Workers' Compensation Benefits, the "<u>Prepetition Employee Obligations</u>").

## ADDITIONAL FACTS RELEVANT TO THIS MOTION

20. As of the Petition Date, the Debtor estimates that Prepetition Employee Obligations in the total amount of approximately $202,107.54 have accrued but remain unpaid, consisting of the following approximate amounts: $70,596.40 for Payroll Obligations; $0.00 for Non-Payroll Compensation[5]; $10,993.37 for Independent Contractor Obligations; $10,851.52 for Prepetition Benefits; $58,180.39 for Third-Party Obligations; $36,485.86 for Reimbursement Obligations; and $15,000.00 for Workers' Compensation Benefits.

---

[5] Despite the fact that the Debtor estimates that certain categories of Prepetition Employee Obligations do not have accrued and unpaid amounts as of the Petition Date, the Debtor nevertheless includes reference to these categories and a request to pay such amounts in the event that it is later determined amounts are accrued and unpaid.
4069426.3

21. Debtor presently has approximately thirty three (33)[6] Employees, consisting of salaried workers and hourly workers. Debtor normally pays salaried associates bi-monthly on the 15th and last day of the month for the prior two weeks. The Debtor last issued salaried payroll checks for the period covering June 1, 2011 through and including June 15, 2011. Salaried associates also worked June 16, 2011 and no payroll checks have yet been issued. The gross payroll outstanding for all salaried Employees, not including employee and employer taxes, is approximately $42,799.29. Debtors normally pay hourly associates weekly on Friday for the period ending the preceding Sunday. The Debtors last issued hourly payroll checks for the period covering June 6, 2011 through and including June 11, 2011. Hourly associates also worked June 13, 2011 through and including June 16, 2011 and no payroll checks have yet been issued. The gross payroll outstanding for all wage Employees, not including employee and employer taxes, is approximately $27,797.11. As of the Petition Date, the total amount of all outstanding payroll due to salaried and hourly Employees is approximately $70,596.40 (collectively, the "Payroll Obligations).

(a) Non-Payroll Obligations

22. The Debtor also provides its Employees with other forms of compensation which may include, but are not limited to, vacation days, holidays, sick leave, and paid holidays (collectively, the "Non-Payroll Compensation"). There are no unpaid obligations for Non-Payroll Compensation owed as of the Petition Date. The Debtor seeks approval to pay Non-Payroll Compensation in the ordinary course of its business even though certain obligations may have accrued prepetition, however, are not yet due and owing. As of the Petition Date, the

---

[6] This number does not include independent sales representative who work as independent contractors for the Debtor. Additionally, many of the Employees (included in the 33) have been laid off due to the Debtor's inability to use the cash collateral of Wells Fargo Bank, N.A. in order to fund payroll. Nevertheless, many Employees have been working for the Debtor on a volunteer basis in order to help preserve the Debtor and its assets.
4069426.3

Debtor anticipates that there is approximately $0.00 in accrued Non-Payroll Compensation for its Employees.

(b) <u>Independent Contractor Obligations</u>

23. Prior to the Petition Date, in the ordinary course of its business, the Debtor contracted with various independent sales representatives outside of Ohio. The Debtor requests to pay up to $11,725 for each independent sales representative provided that each demonstrates the he or she satisfies the requirements of Section 507(a)(4)(B). As of the Petition Date, the Debtor estimates that the aggregate amount of Independent Contractor Obligations is approximately $10,993.37.

(c) <u>Prepetition Benefits</u>

24. Prior to the Petition Date, the Debtor offered its employees certain benefits, including, without limitation, (i) self-insured medical and prescription benefits under Debtors' medical plan administered by COSE/Medical Mutual, (ii) dental insurance plan, (iii) 401(k) plan benefits, (iv) voluntary employee-funded life insurance, (v) voluntary employee-funded short-term disability programs, and (vi) voluntary employee-funded accidental death and dismemberment.

25. The Prepetition Benefits are an integral and important part of each Employee's compensation package. Cessation of these benefits would have a negative impact on the Employees and would undermine the Debtor's operations. Accordingly, the Debtor respectfully requests authority to pay the Prepetition Benefits, including any outstanding prepetition amounts, for the Employees and their eligible dependents in the ordinary course of the Debtor's business and when such obligations become due. As of the Petition Date, Debtor estimates that the aggregate amount of Prepetition Benefits is approximately $10,851.52.

(d) Withholding/Third-Party Obligations

26. The Debtor routinely and ordinarily makes deductions from the Employees' payroll for Third-Party Obligations including, without limitation, federal, state and local tax withholdings and garnishments, among other obligations. The Debtor requests authority to pay over to the appropriate parties all such Third-Party Obligations in accordance with applicable law and existing company policies and practices. The Debtor requests approval to continue making such payments, including those amounts owed prepetition, in the ordinary course of its business. As of the Petition Date, the Debtor estimates approximately $58,180.39 in accrued Third-Party Obligations.

(e) Reimbursement Obligations

27. In the ordinary course of business, the Debtor routinely reimburses employees for certain expenses incurred in the scope of their employment, including expenses for travel, meals, auto expenses, and other miscellaneous business expenses constituting the Reimbursement Obligations of the Debtor. Similarly, Debtor provides certain Employees with company owned vehicles and supplies fuel for such vehicles at Debtor expense. The Debtor estimates that unpaid Reimbursement Obligations as of the Petition Date are approximately $36,485.86. The Debtor requests authority to pay the Reimbursement Obligations accrued as of the Petition Date and to make ongoing payments of Reimbursement Obligations in the ordinary course of the Debtor's business.

(f) Workers' Compensation

28. The Debtor maintains Workers' Compensation Benefits for its Employees. The Debtor processes these claims through established procedures under applicable state law in the ordinary course of the Debtor's business. The Debtor seeks an order permitting it, in its sole discretion, to continue its current procedures with regard to processing and paying the Worker's

4069426.3

Compensation Benefits. The Debtor estimates $15,000.00 in accrued and unpaid Workers' Compensation as of the Petition Date.

29. In the instant case, the Debtor believes that the amount of prepetition wages, salaries, benefits, and contractual compensation owing to or on account of any particular Employee does not exceed the sum of $11,725, allowable as a priority claim under section 507(a)(4) or section 507(a)(5) of the Bankruptcy Code. By this Motion, the Debtor does ***not*** seek authority to pay such Employees more than the $11,725 priority limit to satisfy such claims. Therefore, the payment of these amounts pursuant to this Motion would not deplete assets otherwise available to other unsecured creditors under a plan. Likewise, because the prepetition processing costs are entitled to priority under section 507(a)(5) of the Bankruptcy Code, amounts paid on account of such prepetition processing costs also are not available for distribution to unsecured creditors.

30. A substantial amount of the respective Prepetition Employee Obligations is entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code because all Employees are owed less than $11,725 as part of the individual unpaid Prepetition Employee Obligations. Accordingly, such claims would largely be entitled to payment in full under any plan of reorganization or liquidation.

31. To avoid the serious disruption of the Debtor's reorganization efforts that could result from the nonpayment of any withholding taxes, the Debtor seeks authority to remit all Third-Party Obligations, including prepetition withholdings collected on behalf of the Employees, to the applicable taxing authorities to the extent that the withholdings have not already been remitted. The Third-Party Obligations are held in trust for the benefit of the appropriate federal, state or local taxing authority for employees on behalf of whom such payment is being made.

32. If the Prepetition Employee Obligations are not satisfied, the Employees, as well as their families, will suffer undue hardship. The Employees rely on the payment of the Prepetition Employee Obligations and any further interruption of their payment will likely cause severe disruption of the Employees' personal budgets. Payment of the Prepetition Employee Obligations is necessary to enable the Employees to meet their financial obligations and maintain their health and well-being. It is likely that if the requested relief is not granted, many of the Debtor's Employees may be forced to seek alternative employment. This will severely disrupt the continued operation of the Debtor's business operations. The Debtor's ability to maintain its trained work force and thereby preserve its businesses and assets, as well as the ability to maximize value through the chapter 11 Case will be adversely affected if they are unable to retain its experienced and dedicated Employees.

33. The strength of the Debtor's workforce is essential to the Debtor's ability to continue to operate its business and successfully reorganize. To retain its workforce and skilled employee base, it is essential that the Employees be paid without further interruption and that the Debtor continues to honor its existing practices, policies and benefit programs that affect its Employees in the ordinary course of business.

C.  <u>Cash Management</u>

> **Motion of Debtor and Debtor-in-Possession for Entry of an Order (A) Authorizing Maintenance of Existing Bank Accounts and Continued Use of Existing Cash Management Systems, and (B) Granting a Limited Waiver of the Deposit Guidelines Set Forth in Bankruptcy Code Section 345**

34. Debtor requests authority to maintain its existing bank accounts and to continue the use of its existing cash management system (the "<u>Cash Management System</u>"), available check stock (the "<u>Checks</u>") and existing contracts, invoices, and other business forms (the "<u>Forms</u>"). To service operations, Debtor has a cash management system in place, which is

4069426.3

reviewed and monitored by Debtor's office manager and accounting staff. If Debtor were required to close existing bank accounts (the "<u>Bank Accounts</u>") and open new accounts, there likely would be a significant and costly disruption in Debtor's ability to collect and disburse funds in the ordinary course of its operations.

35. The Debtor maintains the following Bank Accounts at Wells Fargo Bank, National Association, 90 So. 7th Street, 19th Floor, Minneapolis, MN 55479:

| **Account No. Ending** | **Balance as of 6/30/11** | **General Purpose/Type of Account** |
|---|---|---|
| -7147 | $1,161.56 | Operating Account |
| -7154 | $105.56 | Payroll Account |
| -5625 | $46,893.80 | Lock Box Account |

36. The Debtor maintains the following Bank Account at U.S. Bank, Emery-Richmond Office, CN-OH 9182, 4601 Richmond Road, Warrensville Heights, Oh 44128:

| **Account No. Ending** | **Balance as of 6/30/11** | **General Purpose/Type of Account** |
|---|---|---|
| -3476 | $11,665.04 | Deposit Account |

37. The Debtor utilizes the foregoing Bank Accounts in the ordinary course of its business. The Debtor intends to continue such use of the Bank Accounts on a post-petition basis, among other things, to fulfill payroll obligations, to pay operating expenses including, without limitation credit card obligations, to make ACH payments to vendors, and the like. The Debtor does not propose using its existing Bank Accounts other than in the ordinary course of its business unless otherwise ordered or authorized by the Court.

4069426.3

## The Debtor's Existing Deposits

38. The Debtor also seeks a limited waiver of the deposit guidelines set forth in Section 345(b), in order to permit the Debtor to maintain its existing Bank Accounts even though it may, from time to time, exceed the amount insured by the Federal Deposit Insurance Corporation (the "FDIC"). Debtor submits that the Bank Accounts are maintained at financially stable institutions and that a waiver of the Section 345 deposit guidelines would not pose a risk to Debtor's estate nor its creditors.

D.  Cash Collateral

**Motion of Debtor and Debtor-in-Possession Authorizing Interim and Permanent Use of Cash Collateral and Granting Adequate Protection (the "Cash Collateral Motion")**

39. One of Cardinal's pressing concerns is the need for immediate use of Cash Collateral on an interim basis pending a final hearing.

40. Cardinal's ordinary course operations generate Cash Collateral through the collection of accounts receivable. The Lenders assert a security interest in Cardinal's Cash Collateral.

41. Cardinal requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business. Without the use of Cash Collateral, Cardinal's operations will be substantially, immediately, and irreparably harmed. The continued operation of Cardinal's business is essential to its reorganization effort.

42. Cardinal requires the interim use of Cash Collateral for a five (5) week period through August 5, 2011, to pay, among other things, past-due and ongoing payroll, utilities, taxes, insurance, vendors, and other ordinary business costs and expenses.

43. The Cash Collateral proposed to be used by Cardinal consists of cash on hand and cash to be generated from the continued operation of the Cardinal' businesses and collection of accounts receivable.

44. Cardinal believes and maintains that the Secured Lenders are adequately protected in any Cash Collateral that Cardinal may use. As adequate protection for any interest in Cash Collateral that the Secured Lenders have or may have, Cardinal is willing to grant the Secured Lenders replacement liens in Cardinal's postpetition Cash Collateral, to the same extent, priority and validity as Secured Lenders' prepetition liens, if any, and only to the extent that Cardinal diminishes such Cash Collateral. The proposed replacement liens will provide sufficient adequate protection to prevent any diminution in value to the Secured Lenders.

45. Cardinal seeks to use Cash Collateral in accordance with its proposed consolidated budget (with allowance for overage on each expense item not to exceed 10% in the aggregate), a copy of which is attached to the Cash Collateral Motion as <u>Exhibit A</u> (the "<u>Budget</u>"), for a five (5) week period (the "<u>Period</u>") and thereafter upon further order of this Court, following a final hearing on this Motion, on a permanent basis, in accordance with its operating needs. The Budget projects that Cardinal's operations will be cash neutral-to-positive for the Period.

46. Cardinal needs immediate authority to use Cash Collateral to fund day-to-day operations. In sum, the authorization to use Cash Collateral will preserve the going concern value of Cardinal.

47. Cardinal maintains that use of Cash Collateral is absolutely essential for operations and, therefore, is in the best interest of its creditors and estates to authorize the use of Cash Collateral.

E.   Utilities

**Motion of Debtor and Debtor-in-Possession for an Order (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices, (B) Determining that Utilities Have Received Adequate Assurance of Payment for Future Services, and (C) Establishing Procedures for Determining Requests for Adequate Assurance (the "Utilities Motion")**

48.   In connection with the operation of its business, Debtor uses electricity, natural gas, water, sewer, telephone, telecommunications, internet and similar services (collectively, the "Utility Services," each a "Utility Service" from various utility companies (the "Utility Companies," each a "Utility Company"). Attached to the Utilities Motion as Exhibit A is a list of substantially all of the Utility Companies that provide Utility Services to Debtor as of the Petition Date.[7] Debtor estimates that its average total monthly obligation to all of the Utility Companies, based on the last twelve months of usage, is approximately $25,306.13. Uninterrupted utility service at Debtor's business location is essential to the continued operation of Debtor's business and the success of Debtor's reorganization and sale efforts.

49.   Utility services are vital to any company's ability to operate its business. If the Utility Companies are permitted to terminate Utility Services on the 21st day after the Petition Date, while negotiations are continuing and pending a hearing to determine what is adequate assurance, Debtor may be forced to cease operations. The resulting substantial loss of revenue and customers will preclude Debtor from effectively reorganizing or otherwise maximizing the value of Debtor's estate.

---

[7] For each Utility Company, Exhibit A identifies: (a) the name and address of the Utility Company; (b) the account number under which the Utility Company provides service to the Debtor; (c) the type of utility services provided by the Utility Company; (d) the average monthly cost for each Utility Company; and (e) any prepetition amounts owed to the Utility Company. The listing of an entity on Exhibit A is not an admission or final determination that any entity is a utility within the meaning of Bankruptcy Code Section 366, and Debtor reserves the right to amend or supplement such list if Debtor has inadvertently omitted a Utility Company or incorrectly listed an entity on Exhibit A.

4069426.3

50. Debtor proposes to provide a deposit to any requesting Utility Company in an amount equal to Debtor's calculation of the cost of one-half month's worth of Utility Service, over an approximately two week period, based on the historical usage average over the past twelve months (each, an "Adequate Assurance Deposit"),[8] provided that: (a) such request is made in writing no later than thirty (30) days after the Petition Date (the "Request Deadline"); (b) such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit for purposes of this Motion); and (c) such requesting Utility Company is not currently paid in advance for its services.

51. Debtor submits that the availability of the Adequate Assurance Deposit (if timely requested) in conjunction with Debtor's demonstrated ability to pay for future Utility Services in the ordinary course of business (collectively the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Companies.

52. During this Case, the Utility Companies will continue to be paid in the ordinary course of business for undisputed post-petition obligations and will receive such other adequate assurance to which Debtor and the Utility Company may agree. Debtor submits that the Utility Companies will be receiving security that should be acceptable to them. Debtor's proposed method of furnishing adequate assurance of payment for post-petition Utility Services as set forth in the attached proposed order keeps with the spirit and intent of Section 366, is not prejudicial to the rights of any Utility Company, and is in the best interest of Debtor's estate and its creditors. Debtor's payment of post-petition invoices in the ordinary course of business and the Debtor's proposed procedures for processing requests for additional adequate assurance

---

[8] Debtor estimates that any requested Adequate Assurance Deposit for a Utility Company would equal approximately one-half of the "Average Monthly Cost" indicated on Exhibit A attached hereto.
4069426.3

afford any Utility Company requesting additional adequate assurance a reasonable mechanism by which to make such a request and to obtain a court hearing if agreement cannot be reached.

## **CONCLUSION**

53. As described in detail in each of the motions and applications described herein, the relief requested is essential to maintain the viability of Cardinal's businesses and preserve Cardinal's ability to reorganize successfully. I believe that if the relief sought in the First-Day Motions is not promptly granted, at the outset of this case, then Cardinal's business operations could be seriously impaired and its transition to operations within chapter 11 and overall reorganization efforts could be seriously impeded.

Accordingly, for the reasons stated in this Affidavit and in each of the motions and applications filed concurrently or in connection with the commencement of this case, I respectfully request that the relief requested in each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

4069426.3

FURTHER AFFIANT SAYETH NAUGHT.

_____
John Grabner, President
Cardinal Fastener & Specialty Co., Inc.

SWORN TO BEFORE ME and subscribed in my presence this 30 day of June 2011.

_____
Notary Public
My Commission Expires.

EMILY W. LADKY, Attorney at Law
Notary Public - State of Ohio
My Commission has no expiration date.
Section 147.03 R.C.

4069426.3