UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 11-15719 |
| CARDINAL FASTENER & SPECIALTY CO., INC., | Chapter 7 |
| | Chief Judge Pat E. Morgenstern-Clarren |
| Debtor. | |
| | **MEMORANDUM OF OPINION AND ORDER**[1] |

Reminger Co., LPA (the firm) served as special counsel to chapter 11 debtor Cardinal Fastener & Specialty Co., Inc. When the case converted to chapter 7, the chapter 7 trustee asked the firm to turn over documents relating to or belonging to the debtor. The firm declined to do so, responding that at least some of the documents are protected by the attorney-client privilege and the work product doctrine based on the firm's alleged separate representation of the debtor's officers and directors. The trustee then filed a turnover motion, which the firm opposes. For the reasons stated below, the trustee's motion is granted.[2]

## I. JURISDICTION

Jurisdiction exists under 28 U.S.C. 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2), and it is within the court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

---

[1] This opinion is not intended for publication, either print or electronic.

[2] Docket 251.

## II. STIPULATED FACTS

The debtor Cardinal Fastener & Speciality Co., Inc. filed its chapter 11 case on June 30, 2011. On July 18, 2012, the court granted the debtor's motion to convert the case to chapter 7. The chapter 7 trustee and the firm submitted this dispute for decision on these stipulated facts:[3]

     1.     On or about November 14, 2011, the Official Committee of Unsecured Creditors (the "Committee") sent a demand letter (the "Demand") to the Debtor, alleging, among other things, certain claims and causes of action against the Debtor. Following that, the Demand letter states:

> Therefore, the Committee, on behalf of the unsecured creditors, hereby demands payment from the Debtor on the unsecured claims in an amount currently estimated at $4,138,841.00. The Committee further hereby demands that the Debtor provide notice to the Debtor's insurance carrier for the Debtor's directors and officers liability insurance ("D&O Insurance") of the claims being asserted by the Committee.
>
> In addition to the foregoing, the Committee anticipates that the Debtor also possesses claims against its officers and directors, including breach of fiduciary duty, arising from their negligence or fraudulent mischaracterization or misrepresentation of the Debtor's financial statements. Therefore, the Committee further demands that the Debtor provide notice to the Debtor's insurance carrier of the Debtor's claims.

     The Demand letter also states in a footnote:

> The Committee is also in the process of investigating additional claims that the unsecured creditors may possess against the Debtor, its officers, directors, agents and equity holders.

(Exhibit A, Demand Letter; *see also* Application to Employ at Doc. # 186 at p. 4 ¶ 13).

---

[3] Docket 280, 281.

11-15719-pmc    Doc 282    FILED 02/04/13    ENTERED 02/04/13 11:15:13    Page 2 of 17

2. On December 9, 2011, a Reminger time entry reads: "Correspondence to [Debtor's counsel] Rocco Debitetto ("Debitetto") regarding retention by [the Debtor] in connection with claims referenced by [the Committee]." (Exhibit B, Reminger Time Entries ("Time Entries") at p. 3).

3. By letter dated December 15, 2011[4], the Debtor responded to the Committee's Demand letter (the "Response"), stating that Reminger "has been engaged vis-à-vis [the Debtor's] insurer in order to address the alleged claims and causes of action set forth in the Demand Letter, including those regarding alleged director and officer claims." (Exhibit C, Letter from the Debtor to the Committee dated December 15, 2012).

4. On January 11, 2012, the Committee filed its Rule 2004 motion to obtain documents from the Debtor and the Court approved the motion on the same day. (Doc. #'s 175 & 176).

5. On January 12, 2012, the Committee served the subpoena. (Exhibit D, Subpoena and Doc. # 177).

6. On January 24, 2012, Reminger conferred with Debitetto "regarding potential claims against directors and officers, [the] subpoena relating to decisions made by [the] directors and officers, and strategy for further case handling." (Exhibit B, Time Entries at p. 6).

7. On February 14, 2012, Reminger had a teleconference with Debitetto, Mr. Grabner[5] and Mr. Ciuni "regarding financial reclassification of assets in order to better understand the claims of the Committee against [the Debtor's] directors in preparation for further case handling and 2004 examination document production." (Exhibit B, Time Entries at p. 11).

8. On February 17, 2012, Reminger recorded the following time entries:

> Review of cases regarding negligent misrepresentation,
> privity and causes of action belonging to unsecured
> creditors.

---

[4] Although the parties stipulated that the date was December 15, 2012, this is the date stated on the exhibit

[5] John Grabner is a director and officer of Cardinal Fastener & Speciality Co., Inc., although the stipulations do not identify him as such. *See* Corporate Resolution at docket 1; and Affidavit in Support of Chapter 11 Petition and First Day Motions at docket 8.

> Preparation of memorandum regarding review of cases.
>
> Initial research of Ohio and Federal case law regarding causes of action against directors and officers for misrepresentations of financial statements. . . .

(Exhibit B, Time Entries at p. 14).

9. On February 21, 2012, the Debtor filed an "Application of Debtor . . . for the entry of an Order Authorizing the Debtor to Retain and Employ Reminger as Special Counsel, *Nunc Pro Tunc* as of the Date Filed ("Application to Employ"). (Doc. # 186).

10. Also on February 21, 2012, Reminger signed a verified declaration in support of the Application to Employ (the "Reminger Declaration"), stating "Reminger has agreed to advise and represent [the Debtor] … in the above-captioned chapter 11 case in respect of the Alleged Claims." (Doc. #186 at p. 14 ¶ 2).

11. In addition, the Reminger Declaration states:

> 3. Neither I, nor Reminger . . . , as far as I have been able to ascertain after reasonable investigation, have any connection with (a) Debtor; (b) Debtor's executive officers, directors, and shareholder(s); (c) the twenty (20) largest unsecured creditors of Debtor; (d) parties to significant litigation with Debtor; (e) Debtor's secured creditors; or (f) the Office of the United States Trustee (based on Reminger's investigation of its client lists as of the date of this Application), nor does Reminger represent any other known or reasonably ascertainable interest adverse to Debtor in the matters upon which it is engaged.
>
> 4. Should Reminger discover during the pendency of the Case that it represents, in unrelated matters, an entity or person that has an interest adverse to Debtor in the Case, Reminger will disclose such information to Debtor and the Court the nature of such representation and relationship thereto.[1]
>
>> n.1: To the extent that derivative claims are asserted against the Debtor's directors and officers, which has not happened to date, Reminger will revisit the scope of its engagement herein and, if necessary,

>    withdraw from its representation of the
>    Debtor in order to represent the Debtor's
>    directors and officers.

(Doc. # 186 at ¶¶ 3 and 4, and n.1).

   12.   Paragraph 17 of the Reminger Declaration states:

>    17. To the extent that Reminger subsequently discovers any
>    facts bearing on this Verified Declaration or its
>    representation of Debtor, this Verified Declaration will be
>    supplemented and those facts will be fully disclosed to the
>    Court.

(Doc. #186 at ¶ 17).

   13.   On March 6, 2012, Reminger entered the following time entries:

>    Further research of Ohio case law regarding whether
>    directors and officers can be held personally liable for torts
>    committed while in the course and scope of their
>    employment . . . .
>
>    Further analytical review of Ohio case and statutory law
>    regarding personal liability of directors and officers for
>    torts committed while in the course and scope of
>    employment . . . .
>
>    Summarization of Ohio case law regarding whether
>    directors and officers can be held personally liable for torts
>    committed while in the course and scope of employment
>    . . . .

(Exhibit B, Time Entries at p. 16).

   14.   On March 21, 2012, a Reminger time entry reads: "Review cases re[garding] potential claims against directors and officers, standing to assert them, re[garding] potential for proceeds from Travelers[' insurance] policy to wind up in [the] bankruptcy estate." (Exhibit B, Time Entries at p. 16).

   15.   On March 23, 2012, the Court granted the Application to Employ (Doc. # 194) ("Agreed Order"), *nunc pro tunc* to February 21, 2012. The Agreed Order states:

> 3. Debtor shall and hereby is authorized and empowered to employ Reminger as special counsel pursuant to section 327(a) of the Bankruptcy Code, effective *nunc pro tunc* as of the filing of the Application, for matters related to any and all threatened or asserted claims and causes of action potentially covered by the Debtor's Private Company Directors and Officers Liability and Fiduciary Liability Policies, and to respond on behalf of the Debtor to the subpoena served upon the Debtor by the Official Committee of Unsecured Creditors (the "Committee pursuant to the Committee's *Application of the Official Committee of Unsecured Creditors for Entry of an Order, Pursuant to Fed. R. Bankr. P. 2004* [Docket No. 175].

(Doc. # 194 at p. 2 ¶ 3).

16. On July 18, 2012, the Court entered an order granting the Debtor's motion for an order converting the chapter 11 case to a case under chapter 7. (Doc. # 217).

17. On August 1, 2012, a Reminger time entry reads: "Multiple conference with Atty. Debitetto regarding effect of Chapter 7 conversion." (Exhibit B, Time Entries at p. 20).

18. On August 2, 2012, a Reminger time entry reads: "Review Chapter 7 conflict and policy issues." (Exhibit B, Time Entries at p. 21).

19. On October 18, 2012, Reminger sent a letter responding to a request from the Trustee's counsel to turn over its files. In pertinent part, the letter states:

> You have requested that Reminger turn over its complete file in this matter. We believe we are precluded from doing so both legally and ethically.
>
> * * *
>
> While there is no doubt that Reminger was employed as "special counsel" for the "Debtor," a review of the Court's Agreed Order (ECF Doc. 194) is instructive in this matter. While the Agreed Order states that Reminger is employed as "special counsel," it also states the specific purposes of the representation, which demonstrates that Reminger was retained to defend the interests of the Directors & Officers (and potentially only the interest of the Directors & Officers) against claims.
>
> * * *

6

> In other words, based on the Agreed Order, Reminger was employed: (1) to defend against potential claims covered by the Travelers' Policy (which may provide coverage to both the Debtor and Directors & Officers, or only the Directors & Officers); and (2) to represent the Debtor in the limited capacity of responding to the subpoena issued by the Committee. In light of the conversion of this matter to a Chapter 7 bankruptcy, and in light of the fact that you have been retained by the Trustee to represent the Debtor, it is clear to us that there is no issue any longer as to whether we represent Cardinal. You do, and we do not. The issue, however, arises in the context of our engagement to represent the Directors and Officers as individuals.

(Exhibit E, Letter dated October 18, 2012).

\*    \*    \*

To these stipulated facts, the court adds that the firm did not submit a privilege log identifying any of the disputed documents.

### III.  DISCUSSION

#### A. The Trustee's Motion

The trustee asks that the firm be required to turn over all of its files belonging or relating to the debtor, including unredacted copies of the debtor's own documents, together with research memoranda and documentation and any analysis which the firm conducted while serving as the debtor's special counsel. The firm now agrees to turn over the requested unredacted copies,[6] but opposes the balance of the motion.

---

[6] These are documents which the debtor gave to the firm so that it could respond to the subpoena issued by counsel for the Committee of Unsecured Creditors in connection with the Committee's Rule 2004 examination. The firm redacted the documents before producing them to the Committee. The trustee has the redacted documents, but not the original documents. *See* Brief in Opposition, docket 268 at p. 2.

7

The trustee bases his demand on Bankruptcy Code § 542(e) and Bankruptcy Rule 2004. Section 542(e) states that:

> (e) Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

11 U.S.C. § 542(e). The section expressly makes turnover subject to any applicable privilege, which term includes the attorney client privilege and the work product doctrine. *See for example, Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1272 (10th Cir. 1999).

Bankruptcy Rule 2004 provides that the court may order the examination of any entity on the motion of a party in interest and may compel attendance at the examination as well as the production of documents. FED. R. BANKR. P. 2004(a) and (c). A Rule 2004 examination may relate "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate . . . [and in] a reorganization case under chapter 11 of the Code . . . may also relate to . . . any other matter relevant to the case or to the formulation of a plan." FED. R. BANKR. P. 2004(b). "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004). Such an examination is routinely referred to as a fishing expedition and its scope is relatively unlimited. *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002).

### B. The Firm's Opposition

The firm's analysis is two-part: (1) it acknowledges that the trustee is entitled to unredacted copies of all of the debtor's documents that the debtor provided to the firm; but (2) argues that the request for documents *related to* the debtor encompasses documents generated by the firm as part of its separate representation of the debtor's directors and officers, individually. With respect to the second category, the firm claims that the documents are privileged communications and the firm's work product.

### C. Attorney-Client Privilege

"The attorney-client privilege protects from disclosure 'confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client.'" *In re Grand Jury Subpoena (United States v. Doe)*, 886 F.2d 135, 137 (6th Cir. 1989) (quoting *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir. 1983)). The privilege stems from two ideas. "The first is that loyalty forms an intrinsic part of the relationship between a lawyer and client in our adversary system . . ., [which] loyalty is offended if the lawyer is subject to routine examination regarding the client's confidential disclosures." *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir.1998). "The second principle is that the privilege encourages clients to make full disclosure to their lawyers . . . [because] [a] fully informed lawyer can more effectively serve his client and promote the administration of justice." *Id.*

The starting point is Federal Evidence Rule 501, which provides that:

> The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
>
> • the United States Constitution;

9

> • a federal statute; or
>
> • rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

FED. R. EVID. 501 (made applicable by FED. R. BANKR. P. 9017). Under this rule, federal common law determines the scope of the privilege when the underlying claim is based on federal law. *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 712 (6th Cir. 2006). That is the case here where the trustee made his production demand under the Bankruptcy Code and Rules. Consequently, the common law as interpreted by the federal courts governs the firm's claim of privilege. *In re Foster*, 188 F.3d at 1264-65; *In re Hotels Nevada, LLC*, 458 B.R. 560, 569-70 (Bankr. D. Nev. 2011); *French v. Miller (In re Miller)*, 247 B.R. 704, 708 (Bankr. N. D. Ohio 2000).

The elements of the attorney-client privilege under federal common law "are as follows: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d at 355-56. The client is the only party entitled to invoke the privilege. *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986). The party invoking the privilege bears the burden of establishing its existence. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).

### 1.  Who did the Firm Represent?

The firm acted as special counsel to the debtor.  Clearly, an attorney client privilege existed between the debtor and the firm; it is equally clear that the trustee now controls the privilege that formerly belonged to the corporate debtor.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985).  The trustee has waived the privilege, which waiver extends to any privileged communications between the firm and the debtor's officers and directors that were made as part of that representation.  *In re Fid. Guarantee Mortgage Corp.*, 150 B.R. 864, 867-68 (Bankr. E.D. Mass. 1993).  Therefore, it seems that the firm must turn over the requested documents.

The firm, however, argues that it had two separate representations:  one in which it represented the directors and officers individually and another in which it represented the debtor on a limited basis.  The firm contends that it only represented the debtor in connection with the subpoena issued by the Committee to obtain documents for its Rule 2004 examination; conversely, it argues that it did not represent the debtor on issues related to the Traveler's D & O insurance coverage.

The court notes that the firm's analysis skips what should be the first step: the firm identifies its alleged individual clients by name and shows that each asserts the privilege.  That evidence is missing here.

If one moves beyond that fundamental problem, the next obstacle to the firm's position is that it contradicts the language of the application through which the firm sought retention, as well as the order authorizing that retention.  The application and the order state that the firm was being retained as the *debtor's* counsel with respect to both matters.  Consequently, the debtor was

11

the firm's client with respect to both matters.  As the client, the debtor was the party entitled to assert the attorney-client privilege with respect to its communications with the firm.

There is no evidence to support the firm's assertion that it represented any individual officer or director.  While the firm's brief states that Travelers selected the firm to defend the directors and officers individually with respect to any claims possibly covered by the insurance as a consequence of the Committee's November 14, 2011 demand letter,[7] that statement is not evidence and the stipulated facts do not show that there was an individual representation.  The firm specifically stated in its February 21, 2012 declaration submitted in connection with its retention as debtor's special counsel that the firm did *not* have any connection with the directors and officers based on an investigation of the firm's client lists.[8]  Additionally, the exhibits provided with the stipulations, such as the firm's billing statements, do not identify the directors and officers as clients.   And, finally, the firm has not identified any specific documents which it prepared on behalf of the directors and officers as individuals.  *See* FED. R. BANKR. P. 7026 (made applicable by FED. R. BANKR. P. 9014(c)) (incorporating FED. R. CIV. P. 26(b)(5)(A)).

**2. Alternatively, if the Firm did represent both the debtor and, individually, the officers and directors, can the officers and directors assert privilege against the trustee?**

Even if the firm did represent both the debtor and the individual directors and officers in connection with alleged and potential claims covered by the insurance, the rules relating to an attorney representing two clients on a matter of common interest would require the firm to comply with the trustee's request.

---

[7] Docket 268 at 4.

[8] Docket 186, Exh. A at ¶ 3.

"Under the joint-client privilege, clients may jointly retain (or one client may retain for the benefit of others) an attorney as their common agent on a legal matter of common interest. With respect to matters of common interest, each joint client may be privy to the other's communications with the attorney without the attorney-client privilege protection being waived by that breach of confidentiality." *In re Hotels Nevada, LLC*, 458 B.R. at 570; *see also In re Teleglobe Comm'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("When co-clients and their common attorneys communicate with one another, those communications are 'in confidence' for privilege purposes. Hence the privilege protects those communications from compelled disclosure to persons outside the joint representation."); *Grand Trunk Western R. Co. v. H.W. Nelson Co.*, 116 F.2d 823, 835 (6th Cir.1941) (same); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(1) (2000).

As the trustee points out, the established rule is that joint clients who have employed an attorney as their common agent with respect to a matter may not assert the privilege in later litigation between the joint clients. *In re Hotels Nevada, LLC*, 458 B.R. at 570; *In re Ginn-La St. Lucie Ltd.*, 439 B.R. 801, 804-5 (Bankr. S.D. Fla. 2010); *see also In re Teleglobe Comm'ns Corp.*, 493 F.3d at 366; *Grand Trunk Western R. Co.*, 116 F.2d at 835; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(2) (2000). One court noted:

> The attorney-client privilege protects joint client communications from discovery by third parties. Among joint clients, however, the privilege may not be used either to restrict access to, or to preclude use of communications between the attorney and the clients that relate to those matters in which they had a common interest and about which they collectively consulted the attorney.

13

*Brownsville Gen. Hosp., Inc. v. Brownsville Prop. Corp. (In re Brownsville Gen. Hosp., Inc.)*, 380 B.R. 385, 390 (Bankr. W.D. Pa. 2008). This exception has been applied in the context of a § 542(e) turnover request. *In re Hotels Nevada, LLC*, 458 B.R. 572-73; *see also Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 439-40 (Bankr. S.D.N.Y. 1997) (stating that the exception applies where a trustee is conducting an investigation to identify claims).

If the firm did in fact represent both the debtor and the directors and officers, individually, with respect to potential claims related to the insurance in the chapter 11 case, their legal interests were aligned at that point. There is no evidence that the directors and officers consulted the firm separately on a matter in which they did not share a common interest with the debtor. Therefore, the representation would necessarily have been a joint one. In that circumstance, the officer and director communications with the firm would not be privileged as to the debtor.

### D. The Work Product Doctrine

The firm also invokes the work product doctrine,[9] which doctrine " protects an attorney's trial preparation materials from discovery to preserve the integrity of the adversarial process." *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-14 (1947)). "Work product consists of the tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal

---

[9] The firm did not identify any particular documents as work product. Given that the firm has the burden of proof, this alone would justify ruling against the firm on this point. Nevertheless, for the sake of resolving the dispute at one time, the court will assume that at least some of the documents can be characterized as work product.

14

theories, planning of strategy, and recording of mental impressions." *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980). The purpose of the work product doctrine "is to allow an attorney 'to assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] clients's interests.'" *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).

The work product doctrine is distinct from the attorney-client privilege; it is a procedural rule of federal law which is governed here by Federal Rule of Civil Procedure 26.[10] *See In re Prof'ls Direct Ins. Co.*, 578 F.3d at 438 (citing *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir. 2006)); *see also In re Elkins*, No. 05-65317, 2012 WL 4327044 at *3 (Bankr. N.D. Ohio Sept. 20, 2012). Civil Rule 26(b)(3) protects "(1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; (3) by or for another party or its representative." *Prof'ls Direct Ins. Co.*, 578 F.3d at 438 (citation and quotation marks omitted). "Once the party requesting discovery establishes relevance, the objecting party has the burden of showing that the material was 'prepared in anticipation of litigation or for trial.'" *In re Powerhouse Licensing, LLC*, 441 F.3d at 473 (quoting *Toledo Edison Co. v. G.A. Tech., Inc.*, 847 F.2d 335, 339 (6th Cir. 1988)). Both the attorney and the client may invoke the doctrine. *In re Antitrust Grand Jury*, 805 F.2d at 163.

---

[10] Rule 26 applies here under Federal Bankruptcy Rules 9014(c) and 7026, which incorporate Federal Civil Rule 26 with exceptions not relevant here.

15

The firm's argument regarding the work product doctrine evolved as the briefing of this matter progressed. Initially, the firm appeared to argue that it could assert the doctrine as a reason to withhold giving the debtor's work product to the trustee. That argument is ineffective: the work product doctrine generally does not apply in situations where it is the client asking for access to documents and information created or collected by his counsel during the course of the representation. The trustee in this case has stepped into the shoes of the debtor and is the client for these purposes; the work product doctrine cannot be asserted against him. *See In re Equaphor Inc.*, No. 10-20490, 2012 WL 1682583 at *5 (Bankr. E.D. Va. May 14, 2012) (collecting cases); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 90 cmt. c (2000) ("When lawyer and client have conflicting wishes or interests with respect to work-product material, the lawyer must follow the instruction of the client.").

In later briefing, the firm acknowledged that the trustee may be entitled to work product related to the debtor, but argues that he is not entitled to its work product related to claims threatened against the directors or officers.[11] This argument also fails because, as noted above, the stipulated facts do not support the firm's assertion that it represented the directors and officers individually. Even if that had been the case, any work product was necessarily for the joint benefit of the debtor and the directors and officers rather than for another party or its representative, as those terms are used in Civil Rule 26(b)(3). *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2011). Moreover, to the extent the work product relates to the joint representation, the work product doctrine would not permit the firm to deny access to its joint client, the debtor. The trustee now holds that position and is similarly entitled

---

[11] Supplemental Brief in Opposition at p. 6, docket 276.

to the documents. *See In re Michigan Boiler & Eng'g Co.*, 87 B.R. 465, 469 (Bankr. E.D. Mich. 1988).

## IV. **CONCLUSION**

For the reasons stated, the firm failed to prove that any documents are protected either by the work-product doctrine or the attorney-client privilege. The trustee's motion is granted. The firm is ordered to produce and turn over the requested documents within 7 days after the date on which this order is entered.

IT IS SO ORDERED.

_____
Pat E. Morgenstern-Clarren
Chief Bankruptcy Judge